IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

EMMA EICHELMANN                                                    PLAINTIFF

vs.                                  CASE NO. **4:07CV1182BSM**

UNUM LIFE INSURANCE COMPANY OF
AMERICA AND BAPTIST HEALTH A/K/A
BAPTIST HEALTH MEDICAL CENTER-
LITTLE ROCK                                                        DEFENDANTS

## ORDER

Plaintiff Emma Eichelmann filed this complaint against defendants pursuant to the

Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*.,

alleging that her long term disability (LTD) benefits were wrongfully terminated.  The parties

have filed briefs on the Administrative Record and the case is ready for disposition.

### I.  BACKGROUND

Plaintiff worked as a Registered Polysomnographic Technologist in the sleep study

center at Baptist Health Systems (Baptist) and is a participant in an employee benefit plan

(Plan) issued by Unum Life Insurance Company of America (Unum) and sponsored by

Baptist.

A.    Plan Provisions

The Plan, which provides LTD benefits to eligible employees, has several provisions

that apply to this case.  First is the Plan's "any occupation" provision, which becomes

effective after an employee has received an initial twelve months of benefits.  That provision

states in pertinent part:

> You are disabled when UNUM determines that
>
> -you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
>
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.
>
> After 12 months of payments, you are disabled when UNUM determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

The Plan contains another provision allowing employees to receive more limited payments in the event of a sickness based on self-reported symptoms or disabilities due to mental illness.  That provision provides in pertinent part as follows:

> Disabilities, due to sickness or injury, which are primarily based on self-reported symptoms, and disabilities due to mental illness have a limited pay period up to 24 months.
>
> UNUM will continue to send you payments beyond the 24 month period if you meet one or both of these conditions:
>
> > 1.  If you are confined to a hospital or institution at the end of the 24 month period, UNUM will continue to send you payments during your confinement.
> > If you are disabled when you are discharged, UNUM will send you payments for a recovery period of up to 90 days.
> > If you become reconfined at any time during the recovery period and remain confined for at least 14 days in a row, UNUM will send you payments during that additional confinement and for one additional recovery period up to 90 more days.
> >
> > 2.  In addition to Item 1, after the 24 month period for which you have received payments, you continue to be disabled and

subsequently become confined to a hospital or institution for at least 14 days in a row, UNUM will send payments during the length of the reconfinement.
UNUM will not pay beyond the limited pay period as indicated above, or the maximum period of payment, whichever occurs. first.

(UACL 847-848).

B.    Factual Background

  1.  Medical History and Approval of LTD Claim

Plaintiff began working for Baptist on January 17, 1983 (UACL 147) and was employed as a Registered Polysomnographic Coordinator at the time of her termination on June 19, 1998. (UACL 196).  Plaintiff applied for disability benefits on September 29, 1998, alleging disability beginning June 18, 1998.  The attending physician's statement (APS) completed by plaintiff's treating physician, Dr. Mary Sain, on September 29, 1998, listed plaintiff's primary diagnosis as fibromyalgia with fatigue, and a secondary diagnoses of hypertension, gastroesophageal reflux disease (GERD), irritable bowel syndrome (IBS), anxiety, and depression.  Dr. Sain noted that plaintiff's fibromyalgia was exacerbated by stress connected with plaintiff's loss of her job.  Dr. Sain anticipated plaintiff to make a complete recovery. (UACL 126).

On January 25,1999, Unum notified plaintiff that she was approved for LTD benefits for the period of disability beginning December 16, 1998.  (UACL 137).  The approval letter did not mention the policy limitations or the rationale for Unum's decision.  In a letter, dated March 4, 1999, Unum notified plaintiff that her claim fell within the 24-month policy

limitation for self-reported symptoms. (UACL 152).

Plaintiff has seen numerous medical providers since the onset date of her disability. Dr. Sain treated plaintiff for IBS, fibromyalgia, depression and fatigue, from June 1998 to March 1999. (UACL 104-30). Dr. Sain noted that plaintiff's fibromyalgia was likely exacerbated by the depression and anxiety associated with her job change. (UACL 118). In August 1998, Dr. Sain referred plaintiff for fifteen physical therapy sessions to treat plaintiff's fibromyalgia. (UACL 59- 72).

Plaintiff began seeing Bev Eckert, a licensed clinical social worker, in June 1998. Eckert referred plaintiff to Dr. Duong Nguyen, a psychiatrist, on July 2, 1998. (UACL 274). Dr. Nguyen noted that plaintiff had a nine-year history of depression, which had worsened over the past year because of chronic fatigue syndrome and fibromyalgia. Dr. Nguyen's initial diagnoses were major recurrent depression, fibromyalgia, hypertension and migraine headaches. (UACL 272). Dr. Nguyen continued to see plaintiff regularly for medication management. The last visit was on October 21, 1999, when Dr. Nguyen reported that plaintiff remained the same and that she continued to state that she suffered from severe fibromyalgia, and was in constant pain. Dr. Nguyen noted that plaintiff's mood was depressed. (UACL 284).

Dr. Nguyen completed a Functional Capacities Evaluation (FCE) on August 27, 1999. He stated that he did not know about plaintiff's physical limitations, but that she continued to exhibit symptoms of depression and anxiety. He opined that plaintiff was unlikely to

improve and to be able to return to work.  (UACL 188-89).

Dr. Sain completed an APS on April 12, 1999.  Plaintiff's diagnosis was degenerative joint disease with fibromyalgia syndrome with secondary conditions of anxiety, depression and irritable bowel. Objective findings in support of the primary diagnosis were x-rays showing a narrowing with spurring of the cervical spine. (UACL 183).

Pursuant to a referral by Dr Sain, Dr. Eleanor Lipsmeyer, a rheumatologist, first saw plaintiff on March 12, 1999.  (UACL 244- 247).   She found plaintiff to have18/18 soft trigger points and marked costochrondral junction pain.  She diagnosed plaintiff with depression and fibromyalgia syndrome. (UACL 246). X-rays of plaintiff's cervical spine showed plaintiff to have disc space narrowing at C5-6 and C6-7 with anterior spurring.  X-rays of the lumbar spine showed facet joint hypertrophy at L4-5 and L5-S1.  In her March 24, 1999 report, Dr. Lipsmeyer stated that she thought plaintiff has degenerative disease both at her cervical and lumbar spine.  "I think most of her symptoms are secondary to degenerative joint disease [DJD] of her back with secondary fibromyalgia syndrome."  (UACL 250).

Plaintiff was first seen by Dr. Leslie  McCasland on May 26, 1999.  She went to him to establish a primary care provider.  (UACL 241).  At the time, plaintiff was on numerous medications, including Serzone, Trazodone, Ambien, Voltaren, Prevacid, Cozaar, and Estrace. Dr. McCasland found plaintiff to have multiple trigger spots located mostly in the upper back. Dr. McCasland's assessment of plaintiff included: hypertension, fibromyalgia, history of migraines, history of seasonal allergies, atypical chest pain, and depression.  (UACL 238).

Dr. McCasland completed an APS on August 27, 1999.  He noted that plaintiff suffered from fibromyalgia, and identified the multiple trigger spots between her shoulder blade, upper arm and occiput as objective findings to support his fibromyalgia diagnosis.  He found plaintiff to be restricted in bending, lifting more than ten pounds, crawling and prolonged sitting.  He determined her prognosis for recovery to be poor.  (UACL 216).  He also completed an Estimated Functional Abilities Form in which he found that plaintiff was limited to 2 hours a day of sedentary activity.  (UACL 216).

Unum continued to pay benefits, and on November 11, 1999, Unum evaluated plaintiff's eligibility for benefits beyond 12 months.  It found that plaintiff's conditions prevented her from returning to work in a gainful capacity.  (UACL 232).  Based on Dr. McCasland's primary diagnoses of fibromyalgia, a history of migraines and depression, with primary symptoms of fatigue and myalgias.  Unum applied the 24 month limitation of payments on plaintiff's claim, for disabilities primarily based on self-reported symptoms, or due to mental illness.  Unum decided that plaintiff would not receive payments beyond December 15, 2000.  (UACL 231).

On November 22, 1999, plaintiff wrote to Unum stating that "during the past year certain diagnoses had been made based on diagnostic testing and physical examinations by qualified physicians." She submitted additional medical documentation from Dr. Lipsmeyer and Dr. McCasland to support the findings. (UACL 257). The additional records included a November 15, 1999, statement from Dr. Lipsmeyer stating that plaintiff has degenerative disc

disease at C5-6, C6-7, and facet joint hypertrophy at L4-5, L5-S1. "This degenerative arthritis with secondary fibromyalgia makes her unable to work." (UACL 256).

On December 15, 1999, Unum notified plaintiff that its November 11, 1999, letter was not a denial of benefits and that Unum's medical staff was reviewing the new medical information to determine whether she was eligible for benefits. (UACL 259).

Steven J. Feagin, M.D., a medical consultant for Unum, conducted a medical file review of plaintiff's claim on January 5, 2000. (UACL 261-262). He could not refute plaintiff's claims of physical complaints given the currently available data. He suggested further investigation including an independent medical examination (IME) with a formal functional capacity examination (FCE). He found minimal degenerative changes in plaintiff's cervical and lumbar spine, which would be expected for plaintiff's age. He believed that it was not reasonable to attribute plaintiff's fibromyalgia complaints to the degenerative changes in the spine. (UACL 262).

Plaintiff's records were reviewed on December 28, 2000, by Dr. Jacob Martin, a medical consultant for Unum in occupational medicine. (UACL 498-500). He found no objective assessment of functionality with respect to plaintiff's fibromyalgia. He concluded that the March 12, 1999 x-ray findings of plaintiff's DJD would not be unexpected in plaintiff's age group. He concluded that plaintiff did not appear to have a physical impairment of such a magnitude to preclude her from performing at some occupation. (UACL 498).

Plaintiff applied for Social Security disability benefits and received a favorable decision, finding plaintiff to be disabled beginning December, 1998.  (UACL 431-432). Plaintiff notified Unum of the SSDI award.

On January 3, 2001, Unum advised plaintiff that there was no current medical evidence establishing that she could not perform her occupation.  (UACL 506-509). It did not review plaintiff's claim under the self-reported provision but under the "any occupation" provision of the Plan.  The denial, however, was limited to a finding by Unum that plaintiff could not perform *her* occupation.  (UACL 507).

On February 12, 2001, plaintiff appealed the January 3rd denial of benefits and submitted additional evidence in support of her claim. (UACL 544-545). Among the information submitted were Dr. Lipsmeyer's records.  She completed an Estimated Functional Abilities Form on August 1, 2000.  (UACL 535-536).  She found that plaintiff could only lift up to ten pounds occasionally, could bend occasionally, could push or pull less than five pounds occasionally but could not kneel, crawl, climb stairs, or reach above her shoulder. Plaintiff could engage in sedentary activity for only 30 minutes.  Dr. Lipsmeyer stated that she did not feel that there would be any significant change in plaintiff's functional ability.

Dr. Lipsmeyer wrote on November 14, 2000, that plaintiff has "degenerative disc disease at C5-6, C6-7 and facet joint hypertrophy at L4-5, L5-S1.  She has degenerative arthritis with secondary fibromyalgia syndrome which makes her unable to work." (UACL 539).

Plaintiff also submitted updated X-rays of plaintiff's cervical and lumbar spines. Comparisons of the December 14, 2000 x-rays were made with the earlier March 12, 1999, x-rays. The December 14, 2000, x-rays showed mild degenerative changes of the cervical spine and severe sclerotic degenerative change in the facet joints at the L3-4, L4-5, and L5-S1, and minimal spondylolisthesis at L4-5. (UACL 538).

On August 1, 2000, Dr. McCasland completed an Estimated FCE for Unum. He stated that plaintiff could never lift more than 20 pounds and could never bend, kneel, crawl, climb stairs, or reach above her shoulder. (UACL 474). He believed that she should sit for two to three hours at a maximum and did not feel that there would be any significant improvement soon in plaintiff's functional ability. (UACL 473).

Bradford Stuman, R.N., a Unum employee, reviewed the additional medical records on March 15, 2001. He determined that plaintiff met the criteria for fibromyalgia, i.e., 18/18 tender points, depression, and sleep disturbances, but that it should not preclude plaintiff from working. In a somewhat contradictory conclusion, however, he stated that the new medical records offered information that would preclude plaintiff from performing work in sedentary or light occupations. (UACL 546-547).

Plaintiff's file was reviewed by other Unum personnel in the orthopedic unit. Despite the treating physicians' reports to the contrary, the reviewing physician noted that there was nothing objective to preclude plaintiff from full time sedentary and light capacity work with occasional bending, stopping, overhead activities and lifting up to 30 pounds. (UACL 549).

Unum notified plaintiff on April 17, 2001, that it had reviewed the additional information but that there was no objective data to preclude her from performing a full time sedentary to light occupation with occasional bending, stopping and lifting up to 30 pounds. Therefore, the decision stood although Unum forwarded the file to quality review. (UACL 533).

Plaintiff appealed the April 17th decision on May 11, 2001. (UACL 558). On June 28, 2001, Unum notified plaintiff that, based on its review of her file, it decided to reinstate her benefits, with reservation of rights, while it continued to investigate plaintiff's eligibility for benefits. Unum stated that it needed to obtain additional medical and vocational information to evaluate plaintiff's ability to perform the duties of a gainful occupation for which she was reasonably fitted. (UACL 567).

During that time, plaintiff continued to seek medical treatment. Unum obtained additional medical records and plaintiff submitted additional evidence in support of her claim. Unum also obtained the notes of Bev Eckert, the psychotherapist who saw plaintiff, for the period spanning between January 1, 2001 through September 11, 2002. (UACL 581-587)

Plaintiff first saw Dr. Elizabeth Pitts on July 26, 2001 to establish primary care. Dr. Pitts completed an APS on September 13, 2001. She noted that plaintiff should neither lift anything over 15 pounds nor stand for prolonged periods of time. She rated plaintiff as having a moderate limitation of functional capacity, and that she was capable of sedentary activity. She also noted that plaintiff has a long history of depression that has been hard to

control, and rated plaintiff as being able to engage in only limited stress situations and limited interpersonal relations.  Dr. Pitts pointed to the trigger points on examination as objective findings for plaintiff's disability.  (UACL 593).

Dr. Pitts completed an APS for Shelter Life Insurance Company on April 18, 2002. She stated that plaintiff can perform only sedentary work, and should not lift, stand for long periods, or walk for long periods.  Dr. Pitts did not know when plaintiff would be capable of returning to either part-time or full-time employment.  (UACL 601).

According to Dr. Pitts' notes of a June 17, 2002 office visit, plaintiff was found to have trigger points throughout her back, in her deltoids and in her quadriceps.  Dr. Pitts found plaintiff to have fibromyalgia with extensive symptoms resistant to all treatment that had been attempted.  (UACL 603).

Plaintiff continued to be treated by Dr. Lipsmeyer. On June 18, 2001, Dr. Lipsmeyer wrote that she saw plaintiff on June 14, 2001. She enclosed a copy of x-rays done on December 14, 2000.  Dr. Lipsmeyer stated that plaintiff had "mild degenerative change of her cervical spine, but severe sclerotic degenerative change in the facet joints at L3-S1.  In addition, she has a mild spondylolisthesis at L4-5.  Because of her pain, and her x-ray findings, I feel that [plaintiff] is totally and permanently disabled."  (UACL 547).

On June 28, 2002, Dr. Lipsmeyer wrote to Dr. Pitts that plaintiff continues to have pain "that is diffuse and involves her muscles and her joints.  She continues to have difficulty in movement.  She has done weight exercises, but they increase her pain."  Plaintiff reported

that she walked 30 to 40 minutes twice a day.   On examination, Dr. Lipsmeyer found

plaintiff's neck to have flexion to 40 degrees, extension to 5 degrees, and bilateral rotation to

60 degrees. Plaintiff's back had a full range of motion, with trigger points present 18/18.

"There was pain with palpation in the thoracic spine at the mid scapular area.   Bones, joints,

and extremities had full range of motion without active synovitis."  Dr. Lipsmeyer concluded

that plaintiff had DJD of her cervical and lumbar spine, and secondary fibromyalgia.  (UACL

580).  .

Dr. Nancy Beecher, a physician certified in family practice and insurance medicine and

employed by Unum as vice president and senior medical director, reviewed plaintiff's medical

records on November 13, 2002.  Dr. Beecher concluded that all of plaintiff's symptoms were

"self reported and subjective and out of proportion to any underlying medical condition.  Her

DJD is mild to moderate and would not cause impairment from sedentary to light physical

demand work."   Dr. Beecher did not believe that plaintiff had any physical evidence of

restrictions or limitations but believed that a psychiatric or psychological review of the records

would be necessary to assess any psychiatric impairment.  (UACL 617-621).

On December 6, 2002, Unum referred plaintiff's medical records to Les Kertay, Ph.D.,

a clinical psychologist and vice president and medical director with Unum.  Dr. Kertay noted

that plaintiff has a longstanding depressive disorder, and the functional capacities associated

with her psychiatric condition were at the most moderately impaired, with general

improvement beginning in early 2001. Since that time, only mild functional impairment was

noted.  Dr. Kertay found no barriers based on plaintiff's psychiatric condition, either alone or as might affect her general medical conditions, that would preclude plaintiff's return to work (UACL 628-631).

Plaintiff's records were referred to Sheila Calabrese, a vocational rehabilitation consultant for Unum, for review on January 3, 2003.[1] Calabrese relied only on the medical reviews provided by Drs. Beecher and Kertay and did not perform an independent review of plaintiff's records.  (UACL 635).  Calabrese found that plaintiff had skills and aptitudes that are considered transferable and portable to other occupations.  She determined that plaintiff was capable of light work, which involved lifting or exerting force up to 20 pounds occasionally and/or 10 pounds frequently.  She identified three occupations with similar work activities in similar industries which would accommodate physical capacities at the sedentary to light physical demand levels.  The identified occupations were within 60 percent or more of plaintiff's salary as of the onset of her disability.  (UACL633-635).

2.  Reinstatement of Plaintiff's Benefits to 2004 Termination

On January 24, 2003, Unum notified plaintiff that it had reinstated her benefits under reservation of rights.  She was paid benefits for the period of December 16, 2000 through January 15, 2003.  Unum stated that it needed additional information to make a final determination of plaintiff's eligibility under the "any occupation" definition and that it needed

---

[1]The report is dated January 3, 2002; however Calabrese refers to records from December 2002.  The court concludes that the date is incorrect and the evaluation was actually completed on January 3, 2003.

to schedule an independent assessment.  (UACL 636-637).

Dr. Harry Blumenfeld, a rheumatologist, examined plaintiff on July 2, 2003 at the request of Unum. (UACL 684-686).   He found that plaintiff responded with pain to 18 out of 18 of the diagnostic tender points "as described by the American College of Rheumatology criteria for the classification of fibromyalgia." In addition, plaintiff had pain in almost all of the muscle groups in both the upper and lower halves of her body.  An x-ray of plaintiff's lumbar spine revealed that plaintiff had narrowed disc space at the L4 level with first degree spondylolisthesis of L4 on L5.  This was also some narrowing of the L5 disc space.  He diagnosed plaintiff as having severe depression and anxiety, fibromyalgia syndrome, hypertension by history, osteoarthritis of the lumbar spine, and osteoarthritis of the cervical spine by history.  He believed that plaintiff's depression and anxiety prevented her from being fully employed at any occupation, but he did not think that plaintiff was a "malingerer." (UACL 685).  Dr. Blumenfeld believed that the fibromyalgia syndrome was primarily in most part due to her anxiety and depression but that her osteoarthritis of the cervical and lumbar spines did not prevent plaintiff from returning to her former employment or any type of employment of a sedentary type.  He stated that if plaintiff's "depression and anxiety could be further improved, then she would be able to return to work to her former position as a polysomnographic technician or any type of position of a sedentary nature."  (UACL 684). He believed plaintiff's prognosis to be poor because she could not tolerate hardly any antidepressants or non-steroidal anti-inflammatory medications used in the past.

On October 28, 2002, Dr. Lipsmeyer completed a medical assessment of ability to do work related activities which was submitted to Unum.  (UACL 689-691).  Dr. Lipsmeyer stated that plaintiff's impairment affected her ability to lift and carry and that plaintiff could lift or carry only 5 pounds.  Plaintiff's ability to stand and walk was impaired and she could stand or walk only one hour in an 8 hour workday, and 10 minutes without interruption. Similarly, plaintiff's ability to sit was affected by her impairment and she could sit for 1 hour in an 8 hours workday but only 10 minutes without interruption.  She could never climb, stoop. crouch, kneel or drawl, push or pull.  She stated that plaintiff's condition was expected to cause plaintiff severe pain frequently.  Dr. Lipsmeyer stated that plaintiff did not have any past or present psychological problem that would interfere with her ability to work.  (UACL 689-690).  Dr. Lipsmeyer's assessment was based on her medical findings of DJD.

On September 4, 2003, Unum notified plaintiff that it was discontinuing payment of LTD benefits because she did not meet the policy definition of disability and she had already been paid beyond the 24 month period for mental, nervous and self-reported conditions. (UACL  700 - 703).   Unum stated that based on its review of medical documentation from Dr. Pitts and Dr. Lipsmeyer, all plaintiff's symptoms from a physical standpoint were self-reported, subjective and out of proportion to any underlying medical condition.  Unum further stated that Dr. Kertay concluded, based on the records, that plaintiff was not restricted or limited in functional capacity based on a psychiatric condition, either alone or as it might interact with her general medical condition.  Unum further noted that Dr. Blumenfeld opined

that plaintiff's depression and anxiety prevented plaintiff from performing any job.  Unum further relied on the vocational assessment of Calabrese who determined that plaintiff was capable of working as a histotechnologist, a management trainee, or a computer processing scheduler.  Unum concluded that, based on its review of the available medical information in conjunction with plaintiff's occupational skills, plaintiff did "not meet the contractual definition of disability and has also been paid beyond the 24 month period for mental nervous and self-reported conditions." (UACL 701).

On December 3, 2003, plaintiff appealed Unum's denial decision. The appeal was based on the findings of Dr. Lipsmeyer along with medical research articles pertaining to fibromyalgia.  (UACL 704-738). In addition to the previous records from Dr. Lipsmeyer, plaintiff submitted a report of Dr. Lipsmeyer's examination on November 6, 2003.  Her diagnoses included fibromyalgia syndrome, severe; DJD at C2-3, C4-5, C5-6, and DJD of the facets at L3-4, L4-5, and LS5-1.  She noted full range of motion of all joints, and a good grip and curl of the hands.  The back showed tender points present 18/18 and an area of marked muscle spasm beneath the right scapula.  (UACL718).

Dr. Beecher reviewed the additional medical records submitted on February 10, 2004. (UACL 787)  Dr. Beecher found Dr. Lipsmeyer's physical capacity examination to be too restrictive. Dr. Beecher believed that recommended treatment for fibromyalgia syndrome "is graduated exercise and cognitive behavioral therapy (CBT)," neither of which was mentioned by Dr. Lipsmeyer.  She agreed with

Dr. Blumenfeld that the 'but for what she would be working' is her psychological problems and somatization of these. This does not mean that she has a psych condition that is impairing or a physical one that is impairing. It may only mean that her perception of her health and her capabilities is worse than the actual fact due to her psychological issues. That is what CBT is meant to address.

Dr. Beecher believed that sedentary to light physical demand work would be therapeutic for plaintiff. She also attached a statement, which appears to have been taken from some unidentified source, that states:[2]

The classic description of FMS [fibromyalgia syndrome] is with the typical Tps [trigger points]. When the person is tender all over and not just at the trigger points, this does not fit the description of FMS, which requires individual Tps. This syndrome has been named psychogenic rheumatism, due to the heavy influence of psychological conflict and distress associated with this syndrome. It is usually impossible to say whether the depression comes first or pain complaints come first, except when documented historically as they feed into each other in a cycling of depression, pain, depression, etc. That is why CBT and exercise are the best known combination to break this cycling and achieve improvement in symptom level and functionality.

(UACL 785-786).

Plaintiff submitted another letter from Dr. Lipsmeyer dated January 23, 2004. Dr. Lipsmeyer stated that plaintiff

is totally and permanently disabled because of medical problems including [DJD] at C2-3, C4-5, C5-6 and [DJD] of the facets at L3-4, L4-5, L5-S1. She has significant fibromyalgia syndrome with daily pain and disability. She is depressed but her medical problem of [DJD] in her neck and lumbar spine and fibromyalgia syndrome make her permanently and totally disabled.

---

[2]The statement is in a completely different type, size and lettering than the rest of the report.

(UACL 792).  Plaintiff also submitted Dr. Lipsmeyer's vitae, which indicates that she is board certified in internal medicine, rheumatology, and allergy and clinical immunology.  She has served as director of the Division of Rheumatology at the University of Arkansas Medical Science Center from 1974-1991.  She has written extensively on the immune system and rheumatoid arthritis.  (UACL 791).

On February 11, 2004, plaintiff submitted records from Dr. Pitts dated February 20, 2002 through December 3, 2003,  and a one page treatment summary by Bev Eckert, LCSW, dated January 26, 2004.  (UACL 822).  Eckert reported that she began seeing plaintiff in June, 1998, and has worked with her on a monthly basis to provide support with plaintiff's "struggle to cope with fibromyalgia and chronic fatigue and the limitations in her lifestyle resulting from these conditions."  (UACL 821).  Eckert believed, based on her long history of working with plaintiff, that plaintiff's depression was "due primarily to her struggle with chronic, debilitating symptoms of her physical ailments."  (*Id.*)

Dr. Pitts performed a comprehensive yearly re-evaluation on November 18, 2002.  Dr. Pitts noted that plaintiff had diffuse myalgias and arthralgias as well as back pain, and tenderness to most major muscle groups.  However, Dr. Pitts found no abnormal range or motion of the joints.  (UACL 809-810).  Dr. Pitts assessed plaintiff as having *inter alia* fibromyalgia that has been very resistant to treatment through Dr. Lipsmeyer, and depression which was stable on Wellbutrin.  (UACL 809).

Dr. Pitts saw plaintiff on December 3, 2003, for a comprehensive re-evaluation.  Dr.

-18-

Pitts reported that plaintiff had "diffuse myalgias typical of fibromyalgia and also has diffuse joint disease from osteoarthritis.  She has degenerative disc disease as well and so has chronic back pain.  Her pain is severe enough that she basically is home bound, only going to her fibromyalgia support group and to church." (UACL 820).  Dr. Pitts found that plaintiff had typical fibromyalgia symptoms that have been fairly severe and completely unresponsive to medications.  She had some muscle weakness, and arthralgias typical of osteoarthritis as well as chronic back pain from her DJD.  (UACL 818-819).   Additionally, plaintiff had chronic fatigue syndrome associated with her fibromyalgia which has been stable.  Plaintiff was trying to walk twice a day  Dr. Pitts noted that plaintiff has depression primarily because of her chronic medical problems.  (UACL 820).

Dr. Beecher reviewed the additional notes of Dr. Pitts on February 19, 2004.  She stated that Dr. Pitts' records documented that plaintiff continued to have somatic complaints.  "Dr. Pitts states that she feels that [plaintiff's] depression is secondary to her physical symptoms, however this is impossible to state as the two are so intimately intertwined that [one] can't tell 'what came first the chicken or the egg.' We can say that but for the depression and anxiety, her symptoms would be lessened to the point where she would be more functional and able to do sedentary activities, including work.  This is true beyond a reasonable medical doubt and in agreement with the IME conclusions." (UACL 842).

On February 19, 2004, Unum notified plaintiff that it had completed its appellate review of her claim for LTD benefits.  (UACL 844-848).   Unum first approved benefits under the 24

month self reported symptoms limitation in the Plan.  After conclusion of the 24-month period

and in response to plaintiff's appeal, Unum considered whether plaintiff met the contractual

definition of disability after 12 months of payments.

In denying plaintiff's benefits, Unum relied on Dr. Beecher's statement that the

recommended treatment for fibromyalgia syndrome is graduated exercise and cognitive

behavioral therapy (CBT), neither of which was mentioned in Dr. Lipsmeyer's records.  Dr.

Beecher believed that sedentary to light physical demand work would be therapeutic for

plaintiff.  (UACL 845).

According to Unum, Dr. Beecher also stated that classic fibromyalgia syndrome requires

individual trigger points.  A person being tender all over and not just at the trigger points does

not fit the description of fibromyalgia. Unum quoted that section of Dr. Beecher's February

10, 2004 report quoted above. (UACL 845).  Unum then relied on Dr. Beecher's February 19th

review of the records to find that plaintiff was no longer qualified for LTD benefits as she did

not meet the definition of disability after 12 months of payments.

3.  Plaintiff's LTD Claim - Claims Reassessment  2006

On November 20, 2006, pursuant to a claim reassessment program, plaintiff had her

claim once again reviewed by Unum (UACR 1-26).  The Claims Reassessment Process was

established in accordance with the Regulatory Settlement Agreement, arising from the

Multistate Examination that certain state regulations initiated and an investigation of Unum

by the Department of Labor.  (Plaintiff's complaint, Doc. No. 1, ¶ 17).  She submitted medical

records from Dr. Pitts dated June 4, 2004 and October 26, 2006 and medical records from Dr.

Lipsmeyer, dated January 23, 2004, June 13, 2005, and November 10, 2005.

On June 4, 2004, Dr. Pitts wrote:

[Plaintiff] has severe fibromyalgia which results in recurrent flares of diffuse pain.  She additionally has [DJD] throughout her cervical and lumbar spine which causes significant disability.  She has daily stiffness and pain throughout most of her joints.  She additionally has chronic fatigue that limits her activities.  She follows all medical advise and also does water aerobics to try to maintain as much strength as possible in her muscles.  She does this despite the pain that she experiences with the activity.  Her daily activities are very limited because of her chronic pain and she has flares of pain and chronic fatigue that result in disability to the point that she is bedridden.  All of these physical symptoms have resulted in a situational depression which is under excellent control right now.  She sees Dr. Richard Owings as well as a social worker, Bev Eckert, for counseling.  In my opinion, her disability is a result of her physical medical problems of degenerative disc disease of the back and spine and fibromyalgia and the depression is under excellent control and is also a result of the physical problems.

(UACR 7).

In her report of plaintiff's office visit of October 26, 2006, Dr. Pitts found no trigger

points or tenderness of plaintiff's vertebrae. Plaintiff did not exhibit muscle pain or spasm.

(UACR 9).

Dr. Lipsmeyer examined plaintiff on June 9, 2005.  In a June 13, 2005, letter, Dr.

Lipsmeyer wrote that plaintiff "continues to have severe arthralgia and myalgia because of her

fibromyalgia syndrome.  She is totally and permanently disabled from this syndrome." (UACR

29).  Dr. Lipsmeyer examined plaintiff on November 10, 2005.  (UACR3-4).  She found that

plaintiff still had generalized arthralgia and myalgia, and had a full range of motion of all

joints.  Dr. Lipsmeyer found 18/18 trigger points present.  Dr. Lipsmeyer's clinical symptoms and findings of plaintiff included degenerative disc and joint disease of the cervical and lumbosacral spine indicated by x-rays; "daily incapacitating muscle/joint pain and stiffness of the neck, back, shoulders, elbows, wrists, fingers, hips, knees, feet and toes;" non-restorative sleep disorder (sleep study); debilitating chronic fatigue with poor exercise tolerance; depression and anxiety.  (UACR 3).

As part of its claims reassessment, Unum also received plaintiff's file for disability benefits from the Social Security Administration.  The file included the February 10, 2000, decision of the Administrative Law Judge (ALJ) awarding plaintiff social security disability benefits.  (UACR420-427).  The ALJ stated in relevant part:

> The medical records abundantly support the claimant's long term and· continuing battle with fibromyalgia (Exhibits 4F, laF). In August of 1998, the claimant's treating family physician, Mary K. Sain, M.D. sent the claimant to physical therapy as a result of.an exacerbation of fibromyalgia symptoms that began in May of199B (Exhibit 3F). The physical therapist noted that the claimant exhibited positive tender points for 16 of 18 points. The treatment plan included moist heat, myofascial release, massage, and instruction for fibromyalgia self-help through exercise· and modification of functional activities.

> After the claimant's condition continued to worsen, in March of 1999 Dr. Sain referred the claimant to a rheumatologist, Eleanor A. Lipsmeyer, M.D. (Exhibit 8F). Upon examination, Dr. Lipsmeyer noted that the claimant suffered from· severe diffuse myalgia and arthralgia, chronic fatigue, depression, and sadness. Dr. Lipsmeyer noted diagnostic impressions of depression and fibromyalgia, and changed the claimant's medication. Dr. Lipsmeyer reported back to Dr. Sain on March 24, 1999 that she believed the claimant has degenerative disease both at her cervical and lumbar spine. This was based on x-rays of the cervical spine that· showed disc space .narrowing· at- C5-6 and C6-·7 with anterior spurring, and x-rays of the lumbar spine that showed  facet joint hypertrophy at L4-5 and LS-S1. Dr. Lipsmeyer further reported her opinion that most of the claimant's symptoms are secondary to degenerative joint disease of her back with

secondary fibromyalgia syndrome. Dr. Lipsmeyer has continued to treat the claimant through the date of the hearing.

In May of 1999, the claimant also began additional treatment for her physical impairments by Leslie McCasland, M.D. at the Little Rock Diagnostic Clinic (LRDC) (Exhibits 13F, 16F). Dr. McCasland noted that exam is positive for multiple trigger points indicating fibromyalgia, and that the claimant spends half the day in bed. Dr. McCasland notes that the claimant is in a fibromyalgia support group and expressed her opinion that the claimant has severe limitation of functional ability, and that the claimant is unable to engage in stressful situations or engage in interpersonal relations.

(UACR 455-56).

The ALJ found that plaintiff suffered from degenerative disc disease, fibromyalgia, and depression, and that her allegations of complete inability to work were credible.  The ALJ determined that plaintiff retained the physical residual functional capacity to do work at the sedentary level of physical exertion, defined as occasionally lifting and/or carrying up to 10 pounds; frequently lifting and/or carrying less than 10 pounds; standing or walking for up to 6 hours in an 8 hour workday; and sitting for up to 6 hours in an 8-hour workday.  Based on the Medical-Vocational Guidelines, a finding of "disabled" was warranted.  (UACR 00451-453).

Rita Marin RN, CCM, a senior clinical consultant for Unum, reviewed plaintiff's records on March 9, 2007.  (UACR 466-469).  Marin concluded that plaintiff had restrictions and limitations of an inability to perform greater than light level activities on a sustained and consistent basis from the date of the claim closure on August 15, 2003 to the time of the report. (UACR 466).

On March 20, 2007, plaintiff's medical file was reviewed by Steward H. Russell, D. O.,

M.P.H. a consulting physician for Unum who is board certified in occupational medicine. (UACR 470-472). Dr. Russell found that there was support for disability due to mental and nervous disorder since 1998, but plaintiff would be limited to the 24 month Plan limitations. He opined that plaintiff **may** have fibromyalgia, "although that diagnosis is suspect based on the rheumatologic IME demonstrating pain and tenderness everywhere in her body." (UACR 471) (emphasis added). Dr. Russell believed that the arthritic changes in plaintiff's cervical spine could be expected in someone of plaintiff's age, but the Grade I spondylolisthesis at L4-5 would limit plaintiff to no lifting and carrying over 20 pounds occasionally and 10 pounds frequently. According to Russell, plaintiff should avoid frequent bending, squatting, stooping and climbing ladders, but she can climb stairs, kneel, crawl, and drive and ride in a vehicle. (UACR 470).

Unum notified plaintiff in letters dated April 25, 2007 and May 1, 2007, that its determination to deny plaintiff benefits would not be changed as a result of the reassessment and that no further review would take place. (Plaintiff's complaint, Doc. No. 1, ¶ 17). Plaintiff then filed this action.

## II.  STANDARD OF REVIEW

Where a plan gives the administrator "discretionary authority to determine eligibility for benefits," the court reviews the administrator's decision for an abuse of discretion. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the Plan provides Unum with discretionary authority to determine eligibility for benefits. (UACL 370) ("When making a benefit determination under the policy UNUM has discretionary authority to

determine your eligibility for benefits and to interpret the terms and provisions of the policy.")
While not conceding that the more deferential abuse of discretion applies, plaintiff assumes
application of that standard.

Under the abuse of discretion standard, the administrator's decision will be upheld if it
is reasonable; that is, if it is supported by substantial evidence. *Fletcher-Merit v. Noram
Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir. 2001). "While the administrator's decision need
not be supported by a preponderance of the evidence, there must be 'more than a scintilla.'"
*House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001) (citation omitted).
The reasonableness of the administrator's decision is determined by both the quantity and
quality of the supporting evidence. *Delta Family-Care Disability & Survivorship Plan v.
Marshall*, 258 F.3d 834, 842 (8th Cir. 2001).

The Supreme Court in *Metropolitan Life Ins. Co. v. Glenn,* 128 S. Ct. 2343 (2008)
recently addressed the standard of review in ERISA cases. The Court held that a reviewing
court can consider the conflict of interest arising from the dual role of an entity as an ERISA
plan administrator and payer of plan benefits as a factor in determining whether the plan
administrator abused its discretion in denying benefits. *Id.* at 2350 (conflict is factor to be
weighed in determining whether there is abuse of discretion). Plaintiff, however, has not
argued a "palpable conflict of interest or a serious procedural irregularity" that caused a
"serious breach of the plan administrator's fiduciary duty." *Parkman v. Prudential Ins. Co.
of Am.*, 439 F.3d 767, 772 n. 5 (8th Cir. 2006) (quoting *Woo v. Deluxe Corp.*, 144 F. 3d 1157,
1160 (8th Cir. 1998)). The court need not consider the conflict as it is clear that Unum's

decision was arbitrary and capricious.

## III.  DISCUSSION

Plaintiff seeks judicial review of Unum's decision that she failed to meet the Plan's definition of disability.  In this instance, Unum completely rejected the opinions and findings of plaintiff's treating physicians to rely on those of its own paid consultants to support the February 2004 decision denying benefits.  To justify the denial of benefits, Unum's reviewers determined that plaintiff's depression was her disabling condition and there was no physical evidence to support plaintiff's complaints.

Plaintiff provided objective evidence to support her disabilities.  Unum's reliance on the self-reporting limitation has been rejected by the 8th Circuit in the case of fibromyalgia. *See Chronister v. Baptist Health*, 442 F. 3d 648, 656 (8th Cir. 2006) (Eighteen point "trigger test" qualifies as a "clinical examination standardly accepted in the practice of medicine"). "[T]rigger point findings consistent with fibromyalgia constitute objective evidence." *Johnson v. Metro. Life Ins. Co.*, 437 F. 3d 809, 814 (8th Cir. 2006).  Even Unum's own independent medical examiner, Dr. Blumenfeld, found that plaintiff had 18/18 trigger points.

The record does not indicate whether Unum's medical reviewers had any expertise or experience in dealing with fibromyalgia.  *See Morgan v. UNUM Life Ins. Co. of Am.*, 346 F.3d 1173, 1178 (8th Cir. 2003) (reviewing physician's opinion not substantial evidence where opinion was contrary to opinions of two primary treating physicians, and record did not show that reviewing physician had expertise or experience with disability at issue).  Indeed, Unum relied on the statement of its vice president and senior medical director, Dr. Beecher, regarding

CBT and her assessment that plaintiff was suffering from psychogenic rheumatism; a conclusion that was not found by either plaintiff's treating physician or Unum's independent medical examiner.  Dr. Beecher's opinion was in direct conflict with the opinion of plaintiff's treating physicians.  Moreover, Dr. Blumenfeld, the only independent specialist who examined plaintiff, made no such claim.  He believed plaintiff to be suffering from fibromyalgia syndrome.

Furthermore, Unum failed to adequately address plaintiff's well-documented degenerative disc and degenerative joint disease.  One medical reviewer noted that the changes could be expected of someone of plaintiff's age.  This conclusion was carried over to subsequent reviews, without any analysis.  Unum rejected the opinion of plaintiff's treating physician, a specialist in rheumatology, who consistently noted and documented plaintiff's degenerative disc and joint diseases of the cervical and lumbar spine.

Unum concluded that plaintiff's disabling condition was her depression, which was limited by the 24-month provision.  There is no doubt that plaintiff suffers from depression, but her physicians as well as her therapist found that her physical ailments caused her depression.  Furthermore, plaintiff 's depression improved while she continued to suffer from her physical impairments.

The record overwhelmingly supports a finding that plaintiff is disabled.  No doctor suggested that plaintiff was malingering and all her physicians stated that she was experiencing disabling symptoms  That, however, does not end the inquiry.  Plaintiff is not entitled to LTD benefits if Unum can show that she is able to perform the duties of any gainful occupation for

which she is reasonably fitted by education, training or experience.

There is insufficient evidence in the record to support Unum's conclusion that plaintiff meets the "any occupation" definition of disability. Unum continued to find that plaintiff could perform at a light level of work activity despite the evidence from her physicians that she is limited, at most, to sedentary activity   In the  vocational assessment relied upon by Unum, Calabrese, a Unum consultant, considered only the medical reviews of Drs. Kertay and Beecher and did not independently review the records.  Thus, in her assessment, she relies on Dr. Beecher's statement that all of plaintiff's "symptoms are self-reported and subjective and out of proportion to any underlying medical condition." Certainly, a fair, objective transferable skills assessment should include review of all plaintiff's medical records, not just the opinions of Unum medical reviewers.  Furthermore, neither Calabrese nor any other Unum reviewer, actually tested and assessed plaintiff's functional capacity.

Remand is appropriate when a plan administrator fails to make adequate findings or explain the rationale for its decision. *See Abram v. Cargill, Inc.*, 395 F.3d 882, 887 (8th Cir. 2005) (court may remand when plan administrator fails to make adequate findings or explain rationale for its decision). Here, there is insufficient evidence to establish that plaintiff can perform the duties of any occupation for which she is reasonably fitted.  Remand is warranted as Unum failed to adequately develop the record regarding plaintiff's functional capacity.  *See Pearson v. Group Long Term Disability Plan for Tyco Int'l*, 538 F.Supp. 2d 1073 (E.D. Ark. 2008) (remand where plan administrator failed to consider psychiatric or cognitive impairment when determining whether plaintiff could perform essential duties of any occupation).

.                                    *IV. CONCLUSION*

For the reasons stated above, the decision of Unum determining that plaintiff was no longer eligible for long-term disability benefits is reversed, and the claim is remanded for further proceedings consistent with this opinion. Unum must consider plaintiff's functional capacity to perform the duties of any occupation for which she is reasonably fitted considering plaintiff's physical impairments, the side effects of any necessary medications, her age, and other considerations contained in the administrative record. The parties should also consider obtaining a new transferable skills analysis report.

Because action by the Plan Administrator may be dispositive of the issues in this case, the Clerk is directed to administratively terminate this case in his records without prejudice to the right of the parties to reopen the proceedings for good cause shown for the entry of any stipulation, order, or for any other purpose required to obtain a final determination of the litigation.  Provided however, this case will not be reopened unless within 60 days of the final disposition of the above proceeding an application to reopen is filed herein by one or more parties to this action.  If no such action to reopen is filed within said 60 day period this order shall be deemed a dismissal with prejudice of all claims made in this case.  All pending motions are denied as moot.

IT IS SO ORDERED this 5th day of November, 2008.


_____
UNITED STATES DISTRICT JUDGE